STATE v. NORTHWESTERN NATIONAL BANK OF
MINNEAPOLIS.
STATE v. GEORGE C. ALDONS AND OTHERS.
NORTHWESTERN NATIONAL BANK OF MINNEAPOLIS,
INTERVENER.[1]

April 13, 1945.

Nos. 33,941, 33,942, 33,945, 33,946.

[1]Reported in 18 N. W. (2d) 569.

472

*Faegre & Benson* and *Armin M. Johnson,* for appellant North-western National Bank of Minneapolis.

*J. A. A. Burnquist,* Attorney General, and *William C. Green,* Assistant Attorney General, for the State.

JULIUS J. OLSON, JUSTICE.

We have cross-appeals in two cases, both tried together below and consolidated here. The vital issue common to both cases is whether L. 1943, c. 620, is a constitutionally valid enactment.

We shall first consider the issues presented in State v. Northwestern National Bank. There the state, by action for a declaratory judgment, sought to have the cited act determined to be a valid enactment; that defendant is subject to all its provisions; that the state "is entitled to establish and enforce its rights in and to the funds and other property" described in its complaint which will, under the provisions of the act, "escheat to and become the property of" the state "by reason of the abandonment thereof" by its original owner. Paragraph II of the state's complaint alleged:

"That said defendant held on deposit and otherwise on June 30, 1943, funds and other property, and increase and proceeds thereof, which had been left with it on deposit and otherwise and had not been dealt with for a period of twenty (20) years by additions thereto, withdrawals therefrom, or the assertion of any claim thereto and had been abandoned by the persons who had left said funds and other property on deposit and otherwise with defendant; * * * *"

The bank's answer admitted its corporate existence as a national bank and that there was an actual and justiciable controversy between the parties in respect to the constitutionality of the act as applied to it. In the fourth paragraph thereof the bank alleged:

"Answering paragraph II of said complaint, defendant denies the allegations thereof but alleges that on June 30, 1943, it was indebted to certain individuals, partnerships and corporations, including residents of the State * * * and nonresidents" thereof,

"which indebtedness was evidenced in part by credit balances in commercial or savings accounts, in part by negotiable certificates of deposit, and in part by outstanding negotiable cashier's checks, which said indebtedness had not been dealt with by the owners thereof, by additions thereto or withdrawals therefrom for a period of twenty (20) years preceding said June 30, 1943."

In the companion case of State v. Aldons, the state sought judgment against defendant depositors (13 in number), all of whom are the bank's creditors in various forms of credit such as checking and savings accounts, a cashier's check, and a certificate of deposit. All causes relate to deposits made prior to June 30, 1923, and as to each, separately, a cause of action was pleaded. Jurisdiction was obtained by means of attachment of each depositor's credit in the bank and by publication of process with notice to unknown claimants. The bank intervened on the ground that it had "an interest in the outcome" in each and all of these actions "of such a nature that it may suffer a loss by the direct, legal effect of any judgment entered for plaintiff."

Intervener, in the fourth paragraph of its complaint in intervention, stated that as to the first eleven causes the named defendants had "from time to time prior to June 30, 1923, deposited with" it the amounts alleged by the state "in said causes of action, by reason of which complainant in intervention is now indebted to said named defendants," and that "said defendants have not dealt with said indebtedness * * * by making additions thereto or withdrawals therefrom" since June 30, 1923. It averred lack of knowledge or information sufficient to form a belief as to whether "said defendants have abandoned said indebtedness and therefore denies that said indebtedness has been abandoned." As to the two remaining defendants, Bruno and Larson, it alleged that Bruno, on May 21, 1917, acquired from the bank's predecessor "a negotiable certificate of deposit for $4.95," which has ever since "remained outstanding, and by reason thereof" it "is now indebted to said defendant." But, in avoidance, it denied liability, because, as to whoever may now be the owner of the certificate, the statute of

limitations has run against the owner's claim. It has cited and relies upon Minn. St. 1941, § 541.05 (Mason St. 1927, § 9191). As to Larson, it alleged that on April 15, 1910, a negotiable cashier's check for $6.98 was issued to him and that at all times since the check has "remained outstanding and by reason thereof" it "is now indebted to said defendant," but, in avoidance, it pleads the six-year statute of limitations above referred to.

In this, as in the other action, the bank asserted its claim of unconstitutionality of the act as applied to national banks. That the procedural steps taken are in conformity with all directions and requirements of the act is not questioned.

The trial court was of opinion, and so found, that the act "is valid; that it rightfully includes national banks; and that the procedural steps required by the Act for its enforcement constitute due process of law." It found for the state on all issues, except that as to defendant Bruno it sustained intervener's claim that the statute of limitations was a good defense, basing its conclusion upon our decision in Mitchell v. Easton, 37 Minn. 335, 33 N. W. 910. In respect to defendant Larson's cashier's check, the court was of opinion that—

"in view of the weight of more recent decisions, I do not feel it necessary to extend the rule of the Mitchell case beyond the exact question decided by it. Or, in other words, I do not feel compelled to extend the reasoning of that decision by analogy to either cashier's checks or certified checks."

Judgment was entered upon these findings, and both parties have appealed. The bank assails the validity of the entire act but does not object to the court's findings as to the holder of the certificate of deposit. It is from that part that the state has appealed.

We have stated the issues pleaded, except those upon which the bank places reliance in both cases to support its theory that the act as to it is wholly void on constitutional grounds. Its contentions are set forth as follows:

(1)  Since intervener is a national bank, it is by reason thereof "an instrumentality of the Government," and to enforce the act as to it "would be an improper and unwarranted interference" with its functions as such instrumentality, and that the act "restrains and impedes" the national government in the exercise of its power under U. S. Const. art. I, § 8.

(2)  "It purports to authorize this court to declare the escheat" of deposits "owing by complainant" to its depositors; that "to the extent said indebtedness has been or is owned by natural persons, plaintiff is not required to prove that such persons are dead"; that "to the extent that said indebtedness has been or is owned by corporations or other artificial persons, the existence of any such owners continues until" terminated by "law other than" c. 620, "and the property of such owners does not pass to the State by escheat."

(3)  "It purports to authorize the court" to "transfer" to the state the ownership of money "owing by complainant" to its depositors; that the act "fails to provide any adequate notice" to them "of the commencement of this action" and fails to afford them adequate "opportunity to be heard."  As to its certificate of deposit to Bruno and its cashier's check to Larson, "owing by complainant," that although these "may have been negotiated to a holder in due course or to other transferee" now unknown, the act does not provide adequately for notice to such holder or transferee "of the commencement of this action or any opportunity" to be heard.  Therefore, it is said, these creditors will be deprived "of their property without due process of law."  Minn. Const. art. 1, § 7, and U. S. Const. Amend. XIV.

(4)  Lastly, the act is void "because it purports to authorize the court in this proceeding to transfer to plaintiff the ownership of indebtedness owing by complainant * * * to defendants herein, but fails to provide that in the event of said transfer the obligation of complainant * * * to said defendants is discharged and said Chapter 620 and the enforcement thereof in this action are in violation of the rights of complainant * * * under the contract

clause" of Minn. Const. art. 1, § 11, and U. S. Const. art. I, § 10, and "will subject the" bank "to loss without due process of law."

The state put in issue all these contentions. It is clear, therefore, that the constitutionality of the act is the important question here. While there are other questions involved, to be disposed of later, we shall go at once to that issue.

The procedure under our act, to accomplish its avowed purpose, follows closely the provisions of the California act, construed and sustained in Security Sav. Bank v. California, 263 U. S. 282, 44 S. Ct. 108, 68 L. ed. 301, 31 A. L. R. 391, and the Wisconsin act, construed and sustained in State v. Marshall & Ilsley Bank, 234 Wis. 375, 291 N. W. 361. The principal distinction between our act and those to which we have referred is that under those acts both depositor and bank are made parties defendant. There jurisdiction is obtained of the *res* by personal service of process on the bank and by publication as to depositors and unknown persons. Under our act, only the depositors are made parties defendant, and as to them jurisdiction is obtained of the *res* by attachment of the deposited fund still in the bank's possession. This must precede the service by publication of the summons with notice to unknown claimants (§ 5, subd. 3).

Only *abandoned* funds (§ 5) are involved. The state's theory is that insofar as the depository (bank or other financial institution) is concerned, its rights to such funds are no different from what they would be if the plaintiff were himself the depositor; or, if the plaintiff were a creditor of the depositor and proceeded by means of attachment or garnishment to satisfy his claim (§ 5, subd. 2) or have a levy made under execution after recovery of judgment (§ 5, subd. 7).

The action is brought in the name of the state, by its attorney general. Only when he has become satisfied that reasonable grounds exist for the escheat of the deposit, "by reason of the abandonment thereof" by the original owner, is he authorized to bring the action (§ 5, subd. 1). Subdivision 3 provides for service of summons by publication for a period of four weeks. "With the summons," a

notice must also be published, giving the title of the action and referring to the particular claim. This notice is "directed to all persons other than those named as defendants therein claiming any interest in any funds * * * described in the complaint, and requiring them to appear within 60 days after the first publication of the summons and show cause, * * * why such funds * * * have not escheated to and become the property of the state." A copy of the summons and notice must also be posted in "a conspicuous place" in each depository institution "within 15 days after the first publication of the summons" and "copies thereof mailed within the same period" to each defendant at his "last known place of residence or business." Any interested person may intervene in the action (§ 5, subd. 4). Only upon full compliance with all statutory requirements is the court given "full and complete jurisdiction over all the funds * * * and of everyone having or claiming" any interest therein (§ 5, subd. 5). When such proofs have been furnished, findings made, and judgment entered, the same may "be satisfied only out of the property attached" (§ 5, subd. 7). Section 7 provides:

"Any person claiming to be legally entitled to any of the funds * * * who did not appear in said action, may, within a period of ten years after the entry of judgment therein, sue the state to recover the funds" so taken. And, "in case such person be an infant or under disability, the period of limitation is extended to one year from the removal of such disability." Provision is made for the repayment of the fund to the true owner out of the state's public treasury.

National banks are clearly within the terms of the act (§ 1, subd. 2). Only *abandoned* funds are involved (§ 2). There is a statutory rebuttable presumption created (§ 3) that when any person "has left on deposit" with any banking or financial institution funds not thereafter dealt with for a period of 20 years, without asserting any claim thereto during that period, he "is presumed to have abandoned the same." Banks and financial institu-

tions are required to file statements as to such abandoned funds with the secretary of state at stated times (§ 4, subd. 1[1]).

"A copy of each statement * * * with a notice, directed to whom it may concern, stating that the deposits or other property referred to in the statement have not been dealt with" for the statutory period, "and requesting all persons having knowledge or information relative to the whereabouts of the persons named in the statement, or other possible claimants to the funds * * * to give this information to the subscribing officer, shall be displayed in a prominent place in the banking institution or financial institution for which the statement is filed, accessible to the public, for a period of 30 days from the date of filing" (§ 4, subd. 3).

Section 5 deals with escheated funds and prescribes the manner and means to be employed to reach the same and to have the property judicially adjudged escheated to the state. Other essential requirements to establish *abandonment* and to have *escheat* declared by judgment have been stated and need not be repeated.

The bank has assumed the championship of the rights of its— shall we say—dormant depositors, coupling their rights with its own. Its attack is founded upon the theory that the provisions of our act as to notice to them and their opportunity to be heard are so defective and inefficient in its requirements as to deprive them of a reasonable opportunity to be heard; hence that the bank has no protection if it were to respond to the state's demand for payment of their alleged *abandoned* deposits.

Our statute is strikingly similar to that of Wisconsin, as quoted, discussed, construed, and sustained in State v. Marshall & Ilsley Bank, 234 Wis. 375, 377, 291 N. W. 361, 362, *supra*. There, the bank's defenses were predicated upon the grounds of lack of "due process as to deposits" and, as to both depositor and bank, there was impairment of contract obligations. The Wisconsin court sustained the act largely upon authority of Security Sav. Bank v. California, 263 U. S. 282, 44 S. Ct. 108, 68 L. ed. 301, 31 A. L. R. 391, *supra*.

In Anderson Nat. Bank v. Luckett, 321 U. S. 233, 64 S. Ct. 599, 88 L. ed. 692, 151 A. L. R. 824, the court considered and construed a Kentucky statute, under the provisions of which that state had sought and obtained judgment against the bank under a statute which required every bank or trust company in the state to turn over to the state deposits which had remained inactive and unclaimed for specified periods. The act had been sustained in its entirety by the court of appeals of that state in Anderson Nat. Bank v. Reeves, 293 Ky. 735, 170 S. W. (2d) 350. On remand, the trial court dismissed plaintiff's bill for an injunction to enforce the act. The court of appeals affirmed. 294 Ky. 674, 172 S. W. (2d) 575. In that case also, the bank, assuming to act in its own behalf and in behalf of its depositors, asserted lack of due process and, as applied to deposits in national banks, that it conflicted with the national banking laws (R. S. § 5136, 12 U. S. C. § 24, 12 USCA, § 24) and was an unconstitutional interference by the state with the bank's operations as a banking instrumentality of the United States.

■ As we have seen, we are dealing here with personal property *abandoned* by its owner. In the Luckett case, the court was of opinion that (321 U. S. 240, 64 S. Ct. 603, 88 L. ed. 692, 151 A. L. R. 824):

"* * * At common law, abandoned personal property was not the subject of escheat, but was subject only to the right of appropriation by the sovereign as *bona vacantia*. * * * Like· rights of appropriation, except so far as limited by state law and the Fourteenth Amendment, exist in the several states of the United States." (Citing cases.)

Viewing the present act broadly and, for the moment, eliminating the rights and privileges of national banks, we have the single question of whether, in the circumstances here shown, the state may compel surrender to it of deposit balances where there is substantial ground for belief that they have been abandoned or forgotten. Under our act, the state in acquiring such deposits holds them sub-

ject to all lawful demands of the true owner (c. 620, § 7). Not only must such deposits have remained dormant and unclaimed over a period of at least 20 years before the state may take them, but, in addition, if the true owner appears within 10 years after entry of judgment, the state is required to repay him every dollar it has taken from him.

■ Obviously, all these deposits created a debtor-creditor relationship between the bank and its depositors. The contracts so made were incurred and to be performed in the state where the bank was located and thereby became (321 U. S. 241, 64 S. Ct. 603, 88 L. ed. 692, 151 A. L. R. 824) "subject to the state's dominion."

"* * * And it is within the constitutional power of the state to protect the interests of depositors from the risks which attend long neglected accounts, by taking them into custody when they have been inactive so long as to be presumptively abandoned, * * * just as it may provide for the administration of the property of a missing person." (Citing cases.) *Cf.* Germantown Trust Co. v. Powell, 265 Pa. 71, 83, 108 A. 441, 445.

The bank, as we have seen, does not question its original obligations to its depositors. And it is equally clear that when it is required to pay these funds to the state treasurer, if our act is a valid one, its obligation to the depositor is gone just as effectively as if the bank had been compelled to pay any attaching or garnishing creditor of the depositor.

■ Our next inquiry, therefore, is to determine (321 U. S. 243, 64 S. Ct. 604, 88 L. ed. 692, 151 A. L. R. 824) "whether the procedure by which the state undertakes to acquire the depositors' right to demand payment of the deposits was upon adequate notice to them and opportunity for them to be heard." The facts we have recited clearly demonstrate that here, as in the Luckett case (321 U. S. 245, 64 S. Ct. 605, 88 L. ed. 692, 151 A. L. R. 824) :

"* * * The statutory procedure, so far as it affects depositors, is in the nature of a proceeding in rem, in the course of which property, against which a claim is asserted, is seized or sequestered, and

held subject to the appearance and presentation of claims by all those who assert an adverse interest in it. In all such proceedings the seizure of the property is in itself a form of notice of the claim asserted, to those who may claim an interest in the property."

Due process, as measured by and sustained in Security Sav. Bank v. California, 263 U. S. 282, 44 S. Ct. 108, 68 L. ed. 301, 31 A. L. R. 391, *supra,* and in the Luckett case, *supra,* cannot be said to be wanting under our act.

■ In First Trust Co. v. Matheson, 187 Minn. 468, 472, 246 N. W. 1, 2, 87 A. L. R. 478, 481, Annotation at p. 485, *et seq.,* the question was whether our court had the "means for exercising jurisdiction" in a case where the situs of the property involved was here but defendant beneficiaries were residents of California. Plaintiff brought the action as trustee of an express trust to have the validity of the trust established; and, subject thereto, to quiet title in it of the trust property. We there held:

"* * * With us, as in most states, substantive law is implemented with the procedural device of substituted service. Service of summons may be by publication or personally without the state in the cases enumerated in G. S. 1923 (2 Mason, 1927) § 9235. One of them (subd. 5) is 'when the subject of the action is real or personal property within the state, in or upon which the defendant has or claims a lien or interest, or the relief demanded consists wholly or partly in excluding him from any such interest or lien.' Explicitly providing for the exercise of jurisdiction over personal property, there is no room for negative or restricted interpretation. There is a similar act of congress, Judicial Code, § 57 (28 USCA, § 118) providing that the United States district courts may proceed in rem or quasi in rem by substituted service, personal 'if practicable,' and if not then by publication. There is no longer question of the validity of such laws and the right they give to act, not on or against persons, but solely on or in respect to personal as well as real property and upon or against the interests of per-

sons having or claiming such property or some right therein."
(Citing cases.)

■ Next to be considered is the bank's contention that our stat-
ute infringes the national banking laws and unconstitutionally in-
terferes with it as an instrumentality of the national government.
As to this phase, we have found nothing in the act discriminatory
against national banks. The act simply directs payment to the
state by all banks, state and national alike, of what are presump-
tively *abandoned* deposits. Nor do we find any word in the na-
tional banking laws, either expressly or by implication, conflicting
with the provisions of our statute. As was held in the Luckett case
(321 U. S. 248, 64 S. Ct. 607, 88 L. ed. 692, 151 A. L. R. 824) :

"This Court has often pointed out that national banks are sub-
ject to state laws, unless those laws infringe the national banking
laws or impose an undue burden on the performance of the banks'
functions." And "the mere fact that the depositor's account is in
a national bank does not render it immune to attachment by the
creditors of the depositor, as authorized by state law."

■ As we have seen, a bank account is a chose in action of the
depositor against the bank. In conformity with its contract, in
accepting the deposit the bank is obligated to repay the amount
thereof in accordance with its terms. Thereby the deposit becomes
(321 U. S. 248, 64 S. Ct. 607, 88 L. ed. 692, 151 A. L. R. 824)—

"a part of the mass of property within the state whose transfer
and devolution is subject to state control." And "It has never been
suggested that non-discriminatory laws of this type are so burden-
some as to be inapplicable to the accounts of depositors in na-
tional banks.

"The statute here attacked does not purport to do more than
does any other regulation of the devolution of bank accounts of
missing persons, a function which is, as we have seen, within the
competence of the state."

We think the particular power here asserted by the state is not a

forbidden encroachment upon the rights and privileges of appellant bank.

■ The bank, of course, relies upon First Nat. Bank v. California, 262 U. S. 366, 43 S. Ct. 602, 67 L. ed. 1030, later followed in National City Bank v. Philippine Islands, 302 U. S. 651, 58 S. Ct. 269, 82 L. ed. 504. It is to be noted, however, that in the First National Bank case the decision did not rest on any want of power of a state to demand of a national bank payment of deposits which the state was lawfully entitled to receive. Decision there turned rather upon the effect of the state statute in *altering the contracts of deposit* in a manner considered *so unusual and so harsh* in its application to depositors *as to deter them from placing or keeping their funds in national banks.* That case was carefully considered and distinguished in the Luckett case, *supra.* As there pointed out (321 U. S. 251, 64 S. Ct. 608, 88 L. ed. 692, 151 A. L. R. 824):

"The unusual alteration of depositors' accounts to which the Court referred was plainly the statutory declaration of escheat of depositors' accounts merely because of their dormancy for the specified period, *without any determination of abandonment in fact.* This it treated as in effect *'confiscation'* of depositors' accounts, operating as an effective deterrent to depositors' placing their funds in national banks doing business within the state." (Italics supplied.)

Our law specifically provides that there must be *abandonment* of the deposited property by its owner. The statutory presumption (c. 620, § 3) comes into play and is applicable to such situations as we have in the instant case. Of course, the presumption is rebuttable. But we think, absent any contrary showing or any adverse inference to be drawn from the particular circumstances appearing, that the presumption applies. Even without the presumption, we think the evidence in the record is such as to raise a persuasive inference that there has been actual abandonment. The trial court in its findings (Record, par. V, pp. 48 to 52) carefully reviewed the record and discussed all of appellant's claims. It was

of the view that (Record, par. II, p. 46), since the bank had held these deposits over a period of more than 20 years prior to June 30, 1943, during all of which time the deposited funds "had not been dealt with * * * or the assertion of any claim" thereto made, therefore the fund had been "abandoned by the persons who had left said funds * * * with defendant" bank. Abandonment being an issue of fact, its determination by the trier thereof settles that issue.

We have in this case no *alteration* of the contracts of the depositors, no *confiscation* of property or property rights, and no *harshness* in the treatment of either depositor or depository. And, as we held in First Trust Co. v. Matheson, 187 Minn. 472, 246 N. W. 2, 87 A. L. R. 481, *supra:*

"* * * There is no longer question of the validity of such laws [substituted service of process] and the right they give to act, not on or against persons, but solely on or in respect to personal as well as real property and upon or against the interests of persons having or claiming such property or some right therein."

■ The bank also asserts that it has a valid defense under our statute of limitations against the claims here presented in the form of a cashier's check, a certified check, and a certificate of deposit. The statute relied upon is Minn. St. 1941, § 541.05 (Mason St. 1927, § 9191), which reads:

"The following actions shall be commenced within six years:

"(1) Upon a contract or other obligations, express or implied, as to which no other limitation is expressly prescribed; * * *."

As to a cashier's check, its position is that this is the bank's own obligation, customarily issued by the bank's cashier at the request of the depositor against whose account it is charged, citing in support 5 Michie, Banks and Banking, § 251, and Dean v. Iowa-Des Moines Nat. Bank & Trust Co. 227 Iowa 1239, 281 N. W. 714, 128 A. L. R. 137. In that case a reargument was ordered and had. (227 Iowa 1240, 290 N. W. 664, 128 A. L. R. 137.) Only count I of plaintiff's petition was so reargued. The question there was

whether the statute of limitations had run against a bank draft issued by defendant in 1918 but not presented to the drawee until August 1937. The Iowa statute of limitations limited causes founded upon written contracts to ten years after the cause "accrues." Defendant's demurrer was sustained and upon appeal affirmed. Upon reargument the same result was reached, four justices dissenting, because (227 Iowa 1246, 290 N. W. 667, 128 A. L. R. 143)—

"when the appellee bank issued its draft, its agreement or undertaking was complete. It agreed to pay the draft if it was not paid upon due presentation." And since "The sole and only person that could make due presentation was the appellant," therefore, upon the "undisputed evidence * * * that no demand or presentment was made for more than 19 years," the statute had run and constituted a valid defense.

Four causes of action were involved in that case. We have disposed of the first. The second cause was founded upon a cashier's check dated November 13, 1920, but not presented for payment until August 11, 1937. Defendant's demurrer to the complaint on the ground that the statute of limitations had run was sustained by the trial court, and the supreme court affirmed for the reason that the bank's liability was created from and after its issuance of the instrument, and that thereafter its duty was to pay it, there being nothing on the face of the instrument that the parties intended it to be possessed of the characteristics of a certificate of deposit.

The third cause was upon a certificate of deposit issued November 1, 1905. Not until August 28, 1937, was it presented for payment. The trial court overruled defendant's demurrer. The supreme court sustained that ruling, saying, in substance, that the statute of limitations does not begin to run in favor of a bank on a negotiable certificate of deposit, payable on its return properly endorsed, until its presentment for payment, notwithstanding the provisions of N. I. L. § 70, Minn. St. 1941, § 335.27 (Mason St. 1927, § 7113),

that "presentment for payment is not necessary in order to charge the person primarily" liable.

The fourth count was founded upon a certified check dated May 5, 1919, certified the same day. It was not presented for payment until August 20, 1937. There, also, the statute of limitations was relied upon by defendant. The trial court sustained the demurrer but was reversed on appeal, the supreme court being of the view that the effect of the bank's certification of the check at the request of the holder was to create a new obligation on the part of the bank to the holder. It deemed that the authorities there cited sustained the rule that such a certified check "is not due until presentation for payment." (227 Iowa 1257, 281 N. W. 724.) Numerous cases and text writers are there cited.

In respect to certified checks, the bank's position here is that such certification is equivalent to acceptance by the bank, and, when such certification is made, the drawer as well as the endorsers are discharged and only the certifying bank remains the party liable on the instrument. It cites and relies upon §§ 335.741, 335.742, and 335.27 (§§ 7230, 7231, 7113), claiming that, since such certified check is a demand instrument, the contract represented thereby falls within the provisions of § 541.05 (§ 9191). It relies in support thereof on Weaver v. Harrell, 115 W. Va. 409, 412, 176 S. E. 608, 609. It will be noted, however, that the basis for that opinion was West Virginia's legislative amendment to its N. I. L. (§ 70) Code 1931, 46-6-1, as follows:

"* * * 'The statute of limitations shall not begin to run against the holder of a certificate of deposit or a bank note until after presentment and demand for payment.' * * * The failure of the legislature to include certified checks in the exception to section 70 must be taken as conclusive of the legislative will that the statute of limitations should run against the holder of a certified check in favor of the bank from the date of certification."

In respect to the certificate of deposit here, the bank maintains that the trial court was right in holding that the statute of limi-

tations presents a good defense. It is of the view that Mitchell v. Easton, 37 Minn. 335, 33 N. W. 910, is directly in point, and, since that case has never since been questioned or its legal effect in any way limited, therefore it is the law of this state and if any change is to be made it must be through legislative processes.

The act (§ 1, subd. 6) upon which these cases depend states that the word "deposit" and the phrase "funds or other property," as there used,—

"means the unpaid balance of money or its equivalent received by a banking institution or financial institution in the usual course of business and for which it has given or is obligated to give credit to a commercial, checking, savings, time or thrift account, or which is evidenced by its certificate of deposit, passbook, share certificate, certificate of indebtedness, or other like certificate."

It is true, as claimed by the bank, that the Mitchell case stands unreversed. True, also, it has been cited in many later cases, but in reviewing these we find that they relate to cases involving only promissory notes. In no other case brought before us has a certificate of deposit been subjected to the defense of the statute of limitations. The question here, therefore, is whether a negotiable certificate of deposit of the type here shown is to be classified as a *promissory note* or as a *deposit*.

The general rule, sustained by the great weight of authority in this country, is that such statute does not begin to run against an action upon such certificate where, as here, it is issued by a bank, payable on demand or on return of the certificate properly endorsed, until a demand for its payment is actually made. The cases sustaining that view are annotated in 23 A. L. R. 7, and a later annotation is found in 128 A. L. R. 157. In the author's note we find this:

"The later cases support the majority rule stated in the original annotation that in the case of a certificate of deposit payable on demand or on return of the certificate properly indorsed, the

statute of limitations does not begin to run against an action upon the certificate until a demand is made for the payment thereof."

Sustaining that rule, cases are cited from Illinois, Iowa, Maryland, Missouri, Nebraska, New Mexico, New York, Ohio, Pennsylvania, South Dakota, and Utah. The cases cited in the notes sustain the author's text.

Furthermore, we have the authority of Security Sav. Bank v. California, 263 U. S. 282, 286, 44 S. Ct. 108, 110, 68 L. ed. 301, 306, 31 A. L. R. 391, 395, *supra*, where the court held:

"* * * The contract of deposit does not give the banks a tontine right to retain the money in the event that it is not called for by the depositor. It gives the bank merely the right to use the depositor's money until called for by him or some other person duly authorized." And "It is no concern of the bank's whether the State receives the money merely as depositary or takes it as an escheat."

And that, too, was the holding of the court in State v. Marshall & Ilsley Bank, 234 Wis. 375, 379, 291 N. W. 361, 363, *supra*, where the court said:

"The bank urges in defense that the state statute of limitations had destroyed the claimant's right of action to recover the funds, and that therefore the funds were not 'on deposit or otherwise' when the statute went into effect. If our statute of limitations has destroyed the claimant's rights it is no affair of the bank under the instant statute. The bank's rights as against the state are not affected by it. * * * The bank is not affected by the statute of limitations when it has no right to retain the money."

We therefore think the time has come to adopt the rule that a *deposit* is a transaction peculiar to the business of banking; that we should recognize a *certificate of deposit* to be exactly what on its face it purports to be, a *deposit* with the bank by the *depositor*, and not a promissory note, where the debtor must find the lender to meet his obligation. A "bank is not required to hunt up the

depositor and pay him the money [it owes him], as an ordinary lender is bound to do with his creditor." 5 Zollmann, Banks and Banking (Perm. ed.) § 3154; McCormick v. Hopkins, 287 Ill. 66, 71, 122 N. E. 151, 153; Leach v. Beazley, 201 Iowa 337, 207 N. W. 374; Boyd v. Schneider (7 Cir.) 131 F. 223, 65 C. C. A. 209.

The reason assigned in the opposing cases is that such a certificate is in its character a demand note; hence the statute begins to run from its date. This is well illustrated in our own case of Mitchell v. Easton, 37 Minn. 335, 33 N. W. 910, *supra*, where the certificate read:

"Mower County Bank, Austin, Minn., March 29, 1876.

"L. S. Mitchell, Esq., has deposited in this bank seven hundred fifty and no-100 dollars, payable to the order of himself, in current bank notes, on the return of this certificate properly indorsed, with interest at the rate of ten per cent. per annum.

"Smith, Wilkins & Easton."

The bank was a copartnership. After the certificate was issued, Smith died and the remaining partners continued the business. In its decision, the court assigned as its reason for overturning the judgment for plaintiff rendered in the court below that (37 Minn. 337, 33 N. W. 911):

"The defendants received the money of the plaintiff, and, by the instrument sued on, promised and agreed to repay it, with interest, and by placing their obligation in this form *they manifest an intention to change the character of the transaction from that of an ordinary deposit to that of a debt or loan evidenced by an instrument construed to be a promissory note payable on demand.*" (Italics supplied.)

We have examined the original record in that case and from it find that partial payments were made by defendants upon the instrument as follows: $75 on March 31, 1877; $100 April 10, 1877; and $93.03 May 4, 1878. It therefore seems rather clear that the parties in fact treated the instrument as a promissory note rather than "that of an ordinary deposit."

The Mitchell case has by almost unanimous consent been discredited and found to be out of line with the more modern concept that *bank deposits are not loans* in the ordinary sense, but rather and only banking "transactions peculiar in the banking business, which the courts recognize and deal with according to commercial usage and understanding." 5 Zollmann, Banks and Banking (Perm. ed.) § 3154. Therefore, as an authority otherwise, it should be and is overruled.

■ The bank assigns as error in both cases the court's findings to the effect that the involved deposits had been *abandoned.* Of course, it is right in its claim that a mere presumption is not evidence. We have said so in many cases; but, while not evidence, it is a rule of law dictating decision on unopposed facts, and it shifts the burden of going forward with the evidence to the party claiming otherwise. Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557. Our cases on this phase are found cited and annotated in 2 Dunnell, Dig. & Supp. § 3420.

As we have seen, there is no dispute concerning the bank's original obligations to its depositors. The only matter concerning which there can be said to be an issue is whether the statutory presumption (§ 3) is available and operative. We find in this case no opposing facts. Therefore, the bank's duty as the one bearing the burden to go forward with the evidence has not been met. No effort in that direction was made. On the contrary, the record discloses that ever since 1872 the bank has been operating extensively throughout a large area and in the most populous city of the state. It has been functioning and continues to function in competition with state banks, trust companies, and other financial institutions operating under state or national laws. In all these years it has never, so far as the record discloses, denied meeting its obligations to its depositors in whatever form that relationship was evidenced. It has never heretofore sought shelter under the statute of limitations. During all these years it has used these funds to and for its own advantage. No interest has been paid, nor is any sought. All obligations presently involved are even now carried as valid

and appropriate liabilities in the conduct of its banking business.

We conclude that L. 1943, c. 620, is a valid and constitutional enactment; that it rightfully includes national banks; that the procedural steps required by the act for its enforcement constitute due process; and that the six-year statute of limitations is not available to the bank as to any banking credits presently involved. On its appeal, there must be affirmance; on the state's appeal, a reversal.

So ordered.

